IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THURMAN LEROY SPENCER,

         Petitioner,              No. 2: 05-cv-2456 GEB KJN P

   vs.

ROY CASTRO,

         Respondent.           FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

       Petitioner is a state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction for two counts of premeditated attempted murder (Cal. Penal Code §§ 664, 187(a)), two counts of arson of a structure (Cal. Penal Code § 451(b)), and two counts of exploding a device with the intent to commit murder (Cal. Penal Code § 12308).  Petitioner is serving a sentence of two consecutive life terms.

       This action is proceeding on the original petition filed December 5, 2005. Petitioner raises the following claims: 1) the jury saw a photograph of petitioner wearing jail clothes; 2) denial of the right to be present during trial and the reading of the verdict; 3) petitioner was forced to represent himself at sentencing due to ineffective assistance of

counsel; 4) trial court improperly denied petitioner's request to call witnesses to testify regarding the 1998 firebombing incident; 5) ineffective assistance of counsel (7 claims); 6) trial court erred in admitting evidence of uncharged conduct; 7) denial of right to represent himself; 8) the trial judge was biased; 9) the trial judge improperly denied his motion for substitute counsel.

After carefully considering the record, the undersigned recommends that the petition be denied.

II.  <u>Anti-Terrorism and Effective Death Penalty Act ("AEDPA")</u>

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  <u>Id</u>. at 405.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Id</u>. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id</u>. at 410-11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

2

1  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

2  authority. Woodford v. Viscotti, 537 U.S. 19 (2002).

3  "Clearly established" law is law that has been "squarely addressed" by the United

4  States Supreme Court. Wright v. Van Patten, 552 U.S. 120 (2008). Thus, extrapolations of

5  settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

6  Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

7  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

8  unnecessary showing of uniformed guards does not qualify as clearly established law when

9  spectators' conduct is the alleged cause of bias injection).

10  The state courts need not have cited to federal authority, or even have indicated

11  awareness of federal authority, in arriving at their decision. Early v. Packer, 537 U.S. 3 (2002).

12  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

13  unreasonable application of, established Supreme Court authority. Id. An unreasonable error is

14  one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v.

15  Andrade, 538 U.S. 63, 75-76 (2003). Moreover, the established Supreme Court authority

16  reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

17  as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v.

18  Packer, 537 U.S. at 9.

19  However, where the state courts have not addressed the constitutional issue in

20  dispute in any reasoned opinion, the federal court will independently review the record in

21  adjudication of that issue. "Independent review of the record is not de novo review of the

22  constitutional issue, but rather, the only method by which we can determine whether a silent state

23  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

24  2003).

25  When reviewing a state court's summary denial of a claim, the court "looks

26  through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234

1  F.3d 1072, 1079 n. 2 (9th Cir. 2000).

2        The California Court of Appeal was the last state court to issue a reasoned

3  decision addressing petitioner's claims that the trial court denied his request to call witnesses

4  regarding the 1998 firebombing incident and erred in admitting evidence of uncharged conduct.

5  (Respondent's Lodged Documents 4, 6.)  Accordingly, the undersigned considers whether the

6  denial of these claims by the California Court of Appeal was an unreasonable application of

7  clearly established Supreme Court authority.

8        Petitioner's remaining claims were denied by the California Supreme Court by

9  summary orders.  (Respondent's Lodged Documents 8, 10.)  Accordingly, the undersigned

10  independently reviews the record to determine whether the denial of these claims by the

11  California Supreme Court was an unreasonable application of clearly established Supreme Court

12  authority.

13  III.  Factual Background

14        The opinion of the California Court of Appeal contains a factual summary.  After

15  independently reviewing the record, the undersigned finds this summary to be accurate and

16  adopts it herein.

17        I. The September 2, 1996 Uncharged Act

18  Defendant met the victim, Kathleen Krouskop, in 1995. They began living
    together in an apartment on El Camino Avenue in February 1996. The couple
19  continued to live together intermittently until shortly before defendant's arrest.

20  On September 2, 1996, Krouskop intended to move from the apartment and leave
    defendant, making him angry. While preparing to move her belongings, she left
21  the apartment complex to telephone a friend. When she returned, she discovered
    that one of her cars was on fire in her parking space. Defendant, along with
22  several neighbors, was watching the car burn.

23  After hearing noise, apartment resident Tim Ciraolo ran to his balcony, saw
    Krouskop's car burning, ran to the manager's apartment, and saw defendant
24  walking toward defendant's apartment.

25  After the fire, Krouskop went to stay with her friend Spurgeon Holloway for a few
    weeks. She and defendant then reconciled, and she moved back into the
26  apartment. But the car was a total loss.

Four years later, an arson investigator found a disposable butane lighter and a sock in the car's trunk. Krouskop could not think of any reason why she would have left a lighter in the trunk, but did note that defendant had access to the car keys. The fire had apparently originated in the driver's seat.

II. The November 4, 1998 Firebombing - Counts 4, 5, and 6

At the end of October 1998, Krouskop again left defendant. This time, she moved into Spurgeon Holloway's house. Holloway lived in a four-bedroom house on Willowbrook with his son, his daughter-in-law Renee Holloway Martin,FN3 and their two children.

> FN3. As of October 1998, Renee Martin's last name was Holloway, but by the time of trial, she had changed it to Martin. Thus, we shall refer to her as Martin.

On November 3, 1998, defendant called Krouskop at Holloway's house and asked her to come back to him. Krouskop refused.

At 2:00 a.m. the next morning, Krouskop was coming out of a bathroom when there was a crash, followed by glass breaking and a big boom sound. A fire began in a child's bedroom located in the front of the house. The remains of an explosive device - commonly referred to as a "Molotov cocktail"- consisting of a glass bottle with gasoline in it and a wick, were found in the child's bedroom.

Several weeks later, Krouskop reconciled with defendant and returned to his El Camino Avenue apartment. In his apartment, she discovered notes on defendant's calendar containing Holloway's address and a real estate printout of Holloway's home and address. She also discovered that the clothing that she had left in defendant's closet had been cut up. Defendant admitted that he had cut up her clothing and had left them there "because he wanted [her] to see them."

III. The July 17, 2000 Firebombing - Counts 1, 2, and 3

At the beginning of March 2000, Krouskop left defendant once again and moved into an apartment with her mother about a block away.

In or around early June 2000, she invited defendant to her apartment for dinner so that they could talk about some things.

On July 16, 2000, Krouskop went to see defendant at their former apartment in order to sign papers concerning their car. Defendant asked Krouskop to come back home, but Krouskop refused. Krouskop asked defendant if they could be friends, but defendant said, "[I]f we're not together, we'll never be friends."

Later that evening, Krouskop received a series of "hang-up" telephone calls and one call from defendant, suggesting that she return to their apartment for her microwave.

At about 2:00 a.m., Krouskop was awakened by the sound of her bedroom window breaking, glass flying, and an explosion and fire in her bedroom.

1    Krouskop managed to put out the fire with two rugs.

2    Arson investigators determined that the fire was started by a "Molotov cocktail" that had been thrown through the bedroom window. The investigator found the

3 neck of a glass bottle with a checkered piece of cloth stuck in it, which was identified by Krouskop as similar to dish towels that she had bought with

4 defendant. Two plastic bags smelling of gasoline, one bearing the name of Ralph's and one with the name of Springfield, were found outside Krouskop's window.

5

6    Investigators found the remains of the dish towels in the defendant's apartment, as well as plastic bags from Springfield and other stores (but not Ralph's). A

7 maintenance man discovered that three light bulbs in the carport, near Krouskop's apartment, were unscrewed, thereby preventing them from affording any

8 illumination. Defendant's fingerprint was found on one of the bulbs.

9 (Respondent's Lodged Document 4, pp. 2-6.)

10 IV. <u>Discussion</u>

11    A. <u>Denial of Right to Be Present During Trial and Verdict; Denial of Right to Self-Representation; Denial of Motion for Substitute Counsel</u>

12

13    Petitioner alleges that he was denied his right to be present during the trial and

14 reading of the verdict.  Petitioner also alleges that the trial court improperly denied his motions

15 for self-representation and for substitute counsel.  While these claims will be separately

16 addressed, the following (necessarily) lengthy background section puts them in context.

17    *Background*

18    On March 12, 2001, during pretrial proceedings, petitioner made a <u>Marsden</u>[1]

19 motion.  Petitioner argued that trial counsel's investigator, Mr. Pogue, and trial counsel told him

20 (petitioner) that the charges regarding the 1998 firebombing incident should be dismissed for

21 lack of evidence.  (Reporter's Transcript ("RT") at 56.)  Because the charges were not dropped,

22 petitioner argued that trial counsel had lied to him.  (RT at 57.)  Petitioner also argued that trial

23 counsel should have subpoenaed Nora Savage to testify on his behalf but failed to do so.  (<u>Id</u>.)

24 Petitioner claimed that Nora Savage was no longer cooperating with the defense because Mr.

25

26   [1] <u>People v. Marsden</u>, 2 Cal.3d 118 (1970).

Pogue had done something to offend her.  (RT at 58.)  Petitioner also complained that counsel had not adequately investigated Renee Martin.  Petitioner claimed that Tracy Wallace, the girlfriend of Martin's employer (Clement Williams) committed the 1998 firebombing after learning that Martin had an affair with Williams.  (Id. at 60.)

In response, trial counsel told the court that Nora Savage was subpoenaed.[2]  (Id. at 62.)  Trial counsel stated that he never told petitioner that the charges regarding the 1998 incident would be dismissed.  (Id.)  Trial counsel also stated that while petitioner had a problem with him failing to call victim Krouskop at the preliminary hearing, he did not do so because she could not provide any testimony relevant to the defense.  (RT at 63.)  Trial counsel also stated that at the pretrial hearing being conducted that morning, Ms. Martin was prepared to testify regarding her affair with her employer.  (RT at 64.)  Trial counsel stated that he had been unable to locate Williams or his girlfriend Tracy, the woman who petitioner claimed committed the firebombing.  (Id.)

Petitioner also complained that trial counsel did not adequately communicate with him.  Trial counsel went on to list eleven times he had discussed the case with petitioner.  (RT at 67.)

The trial court denied the Marsden motion, finding that trial counsel had adequately addressed petitioner's complaints during the hearing and that there was no adequate basis for granting the motion.  (RT at 69.)  When asked whether he could continue representing petitioner, trial counsel stated,

> I know he's horribly angry at me and it's certainly cut into this relationship, this professional relationship I have with him, but I think that I can probably still proceed in terms of calling witnesses, in terms of making arguments, making objections, et cetera.

(Id.)

---

[2] As will be discussed infra, Savage was not called to testify.  However, the record does not indicate that she had any information relevant to the defense.

1          Later that day, just prior to the beginning of jury selection, petitioner made a

2   Faretta motion.  (RT at 118.)  Petitioner asked for a continuance of two weeks so that he could

3   study his case.  (Id.)  The trial court denied the request for continuance, then asked petitioner if

4   he still wished to represent himself.  (Id.)  Petitioner responded that he still wanted to represent

5   himself, but he was not ready for trial.  (Id. at 118-19.)  The trial court told petitioner again that

6   his motion for continuance was denied and asked if petitioner still wanted to represent himself.

7   (RT at 120.)  Petitioner responded, "Your Honor, I'm not receiving fair representation at this

8   time."  (Id.)  The court again explained to petitioner that his motion for continuance was denied.

9   (Id.) The following exchange occurred:

10          Court: I'm not saying I'm going to grant you your Faretta rights at this point, but
            understanding that you – your request for a continuance is denied, do you want
11          Mr. Foster to continue to represent you?

12          Petitioner: Your Honor, at this time I'm not ready to go to trial yet.

13          Court: All right.  He's refusing to answer my question.  I'll deem that as a
            continuation of the present legal situation till he responds to the Court's question.
14

15   (RT at 121.)

16          Petitioner's trial counsel then asked for a continuance so that he could attempt to

17   locate Mr. Williams and his girlfriend, Tracy Wallace, in an attempt to investigate the claim that

18   Wallace committed the 1998 firebombing.  (RT at 121-23.)  The trial court denied this request.

19   (RT at 123-24.)  The trial court then again asked petitioner if he wanted to represent himself:

20          Court: Mr. Spencer, you requested to represent yourself.  I need to get some
            clarity from you as to whether you wish to represent yourself and proceed to trial
21          right now.

22          Petitioner: Your Honor, I'm not receiving a fair representation.  I'm not ready to
            go to trial right now.
23
            Court: I understand that, sir.  The question–and you keep asking for a continuance,
24          sir.  I'll ask one more time and if you refuse to answer, I'm going to leave it as–I'll
            deem that a request to remain in the status go–quo with Mr. Foster representing
25          you.  Do you wish to represent yourself in the jury selection and the jury trial at
            this point?
26

1

>Petitioner: At this time, Your Honor, I'm not receiving a–receiving fair representation.  I'm not ready to go to trial.

2

3

>Court: All right.  After repeated questions by the Court, the defendant has refused to respond....

4

(RT at 125.)

5

>The trial court then called the jury panel in for jury selection and asked

6

petitioner's counsel to introduce himself.  (RT at 126.)  Petitioner proceeded to interrupt his

7

counsel:

8

>Trial Counsel: Good afternoon, Ladies and Gentlemen, my name is Greg Foster. This is my client, Mr. Thurman Spencer.

9

>Petitioner: My name is Thurman Spencer, and today is not the–

10

>Court: Mr.--

11

>Petitioner:  –day for me to be having a trial–

12

>Court: Mr. Spencer, have a seat, sir.

13

>Petitioner:  –because I'm not being represented–

14

>Court: I'm ordering you to have a seat.

15

16

(RT at 127.)

17

>The trial court then advised petitioner that he was not to speak to the jury unless

18

he was called as a witness.   (Id.)  The trial court further advised the jury to disregard petitioner's

19

comments and to not hold them against him.  (Id.)  The trial court then proceeded to read the

20

charges against petitioner to the jury.  (RT at 128-29.)  During the reading of the charges,

21

petitioner interrupted:

22

>Petitioner: I object, Your Honor.  I have not even set fire to anyone's house.

23

>Court: Mr. Thurman, you are instructed–Mr.–Ladies and Gentlemen of the Jury, if I could have you step outside please.

24

>Petitioner: I'm being railroaded here.

25

26

////

1    Court: We'll take a brief recess.

2    (RT at 129.)

3    The trial court told petitioner that he could not speak out as he had been doing.

4    (Id.)  The trial court warned petitioner that he could be removed from the courtroom for

5    continued disruptive behavior.  (RT at 130-31.)  The court asked petitioner if he understood what

6    had just been read to him regarding his rights to remain in the court:

7    Court: And, Mr. Spencer, I'm going to tell you again, we're not continuing the
     trial.  Did you understand what I just read to you, sir?

8

     Petitioner: Your Honor–
9
     Court: Mr. Spencer, I want you to–
10
     Petitioner: I'm not ready for trial.
11

12   Court: All right.  He's refusing and the Court would deem his answer a positive
     response as I've read it to him in my presence.  In addition, Mr. Spencer, I want
13   you to understand that if we have continued outbursts and you speak to the jury
     and talk about matters before you are called to the witness stand, that that will be a
14   violation of my order.  You are not to speak out at all in open court.  You can
     certainly whisper to your attorney and communicate with your attorney, but
     speaking out as you have in front of the jury is a violation of the Court's orders.  If
15   you continue to do this, you will be removed from the courtroom and Mr. Foster
     will continue to try the case in your absence.  Do you understand the negative
16   impact?

17   Petitioner: Your Honor, I'm not–

18   Court: Sir, if you'll step out.  Is that Harry?

19   Bailiff: Yes.

20   Trial Counsel: Yes.

21   Court: All right, fine.  It's another attorney that walked in.  Mr. Spencer, do you
     understand that you can be removed for your conduct and the case will continue in
22   your absence?

23   Petitioner: Your Honor, I'm not being fairly represented.  I need time to go ahead
     to–to receive new counsel to represent me on my behalf.
24
     Court: The Court will deem that as a–a yes.  Mr. Spencer, the other matter I want
25   you to understand is that when you do decide to conform your conduct to the
     requirements of the Court, that is not to speak out in open court and try to
26   prejudice the jury against the People or garner sympathy for yourself, you can be

1        returned to the courtroom.  Do you understand that, sir?

2        Petitioner: Your Honor, I'm not fairly being represented.  I need time to receive new counsel to represent myself.

3

4        Court: All right.  And let me just indicate to you again, sir, if you continue, the Court will have no choice but to take other actions.

5        ***
Do you recognize that you run the risk of injuring your case by doing what you're

6        doing in front of the jury?

7        Petitioner: Your Honor, my Constitutional rights are being violated.  I'm not receiving fair representation.  I need time to receive new counsel in order to

8        represent me in regards to this trial.

9  (RT at 132-34.)

10        After a brief recess, the trial court called the jury back in to resume the voir dire.

11  (RT at 135.)  The court continued the reading of the charges against petitioner.  (RT at 136.)

12  Petitioner again interrupted:

13        Petitioner: Your Honor, I did not set–

14        Court:  –35 El Camino Avenue, Section Number 27.

15        Petitioner: I have not burned anything, Your Honor.

16        Court: Mr. Thurman, I've instructed you not to speak out in front of the [sic] and I've admonished, sir, that–

17

18        Petitioner: Your Honor, I'm receiving unfair representation.

19        Court: Mr. Spencer–

20        Petitioner: I filed a <u>Marsden</u> motion this morning.  The <u>Marsden</u> motion proved that–

21        Court: Mr. Spencer–

22        Petitioner:  –that I was not receiving fair representation , Your Honor.

23        Court:  –your force me–Mr. Spencer, I'm instructing you to remain silent.

24        Petitioner: Your Honor, I ask that the Court recognize that.

25        Court: Ladies and Gentleman, I apologize.  Could you step outside one more time.

26  (RT at 136.)

1      After the jury left the courtroom, the trial court asked petitioner if he planned to

2   continue making inappropriate statements.  (RT at 137.)  Petitioner responded, again, that he was

3   "not ready for trial."  (Id.)  The trial court deemed petitioner's response as a refusal to comply

4   with the court's order not to make inappropriate statements.  (Id.)  The court then took a five

5   minute recess so that petitioner's counsel could talk with petitioner in order to convince him to

6   conform with the order.  (RT at 138.)

7      After a brief recess, trial counsel told the trial court that he did not know if

8   petitioner was willing to abide by the court's order.  (RT at 139.)  The trial court again asked

9   petitioner if he would abide by his order not to speak out in front of the jury as he had been

10  doing.  (Id.)  Petitioner responded that his constitutional rights were being violated and he was in

11  the process of receiving new counsel.  (Id.)  The trial court went on to ask petitioner if he had

12  hired an attorney to take over his case.  (RT at 140.)  Petitioner told the trial court that he had

13  consulted with two attorneys who were supposed to come and visit him that day in the jail.  (Id.)

14  Petitioner told the court that the attorneys were Peter Kmeto and Theresa Huff.  (RT at 141.)  The

15  trial court then stated that it would bring the jury in one more time and advised petitioner that if

16  there was one more outburst he would be removed from the court.  (RT at 142.)[3]

17      After the jury was brought in, the trial court began reading the charges against

18  petitioner.  (RT at 143.)  Petitioner again interrupted: "Well, Your Honor, I have not attempted

19  to..."  (RT at 143-44.)  As set forth below, the trial court then asked the jurors to leave the

20  courtroom then ordered petitioner removed.  (RT at 144.)  The trial court told petitioner that if at

21  any time he wished to comply with the court's rules, he was welcome to return.  (RT at 144-45.)

22          All right.  The Court has made numerous efforts and reasonable efforts including
            continue–or, rather, recesses.  I've asked counsel, his counsel, to speak to him a
23          number of times.  I've directly spoken to the defendant numerous times.

24  ────────────────

25      [3] While petitioner claimed he was in the process of hiring a new attorney, the court's
    discussion with petitioner clearly suggests that petitioner did not have the funds to hire an
    attorney.  His present counsel, Mr. Foster, although originally retained, had been appointed after
26  petitioner ran out of money.

It is apparent to the Court that Mr. Spencer is not willing to comply with the Court's requests, that he is prejudicing his own case and possibly prejudicing that of the People's right to a fair trial, and the Court is left with no other alternative that I can define at this point but to proceed in his absence.

Mr. Spencer, if at any time you wish to comply with the Court's rules, that is, that you remain silent and not disrupt the court proceedings–and that remaining silent does not include conversations that are quiet and under breath conversations with your own counsel–but if you will comply with the Court's order and not continue in outbursts such as we've had in here, you're welcome back in my court at any time.

If you choose to hire another attorney, you can do so, but you should understand that that attorney will not be granted a continuance to–or permitted to delay the case in order to prepare for you.  If Mr. Kmeto or Ms. Huff wish to step into this case tomorrow morning, that's satisfactory with me, but I do intend to proceed with the trial.

It's also apparent, and I want to state it for the record, that we've had <u>Marsden</u> motions, we've had the conduct involving refusing to dress out, we've had circumstances that are here on–on the record in front of the jury as well as the requests which are manipulations of the Court in the sense of trying to delay the case and going–requesting (sic) pro per and then refusing to request direct questions of whether he wanted to represent himself, et cetera, are all geared, in the Court's opinion, based on the relevant record as evidence to delay the proceedings.

The Court, based on his conduct here in front of the jury, is–in open court in front of jury is going to order him removed and we'll continue the case in his absence.

Because of his conduct I can't even get through a reading of the simple Complaint, let alone a basic voir dire without the defendant interrupting me and making statements in front of the jury implying, quite frankly and directly, that he's being railroaded–he's said that–by the Court and somehow that the Court is out to injure him.

And I wish to assure you, Mr. Spencer, that is not in any way my desire at all. And, in fact, if you would recall at the preliminary hearing when Mr. Foster brought up the evidence involving third party culpability, specifically the instance involving Tracy Wallace—

****

At the preliminary hearing I permitted, over the People's objection, evidence of the third party culpability to come in so that there would be a record of it and it would be preserved possibly for introduction of evidence in trial.

I have not foreclosed the introduction of that evidence and have indicated to counsel that when they have new information, to advise the Court, and Mr. Foster can renew that motion.  I have not foreclosed the use of that evidence at all.

It is my intent to remove Mr. Spencer based on his conduct here in open court and his unwillingness to comply with the reasonable orders.

Mr. Spencer, if you would indicate to the transporting deputy or any deputy down there–I'll instruct my Bailiff to call later this afternoon and, say, at three-thirty, if he wishes to return to court and indicates that he's willing to comply and not interrupt and Court's proceedings, I will permit him back into my courtroom.

He is removed from the courtroom.  We will proceed in his absence.

(RT at 144-47.)

The trial court then conducted voir dire.  (RT at 150.)  The next day, March 13, 2001, the trial court began the proceedings, outside the presence of the jury, not noting that petitioner was not present.  (RT at 151.)  Deputy Burrow told the trial court that on that morning, petitioner had been transported from the jail to the holding facilities at the courthouse.  (Id.)  When asked by Deputy Burrow whether he wished to come to court and if he would comply with the court's orders, petitioner responded that he had nothing to say.  (RT at 152.)  Deputy Burrow also asked petitioner if he would be willing to watch the trial through a video monitor in another court.  (Id.)  Petitioner again responded that he had nothing to say.  (Id.)  The trial court then asked the bailiffs to bring petitioner to the courtroom so long as they did not have to use force.  (Id.)

When Deputy Burrow returned a few minutes later, he told the court that petitioner had stepped out of his cell and asked where they were going.  (RT at 161.)  Deputy Burrow told the petitioner that the court had requested his presence.  (Id.)  Petitioner stated that he had nothing to say to the court, put his hands behind his back and stepped away from the deputy.  (RT at 162.)  Deputy Burrow determined that bringing petitioner to court would then require a use of force.  (Id.)  The trial court then concluded that petitioner had voluntarily absented himself from the trial.  (Id.)  The trial court also asked Deputy Burrow to again ask petitioner if he wanted to watch the trial via video conferencing from another court room.  (Id.)  The trial court also instructed Deputy Burrow to tell petitioner that if at any time he changed his mind, he would be brought to court.  (Id.)

1    When Deputy Burrow returned to the court after talking to petitioner, he stated

2    that petitioner told him that he had nothing to say in response to whether he would like to have

3    video conferencing set up.  (RT at 164.)  The trial court concluded, "So absent using force, it

4    would appear to me that we'll just leave him downstairs and from time to time check in and see

5    if he's changed his mind, so – all right."  (Id.)

6    The trial court then conducted additional voir dire.  Later that afternoon, the trial

7    court noted that just before noon and after the noon break, his staff had contacted petitioner and

8    asked if he would like to come to court.  (RT at 170.)  Petitioner's response on both occasions

9    was that he had nothing to say.  (Id.)  Petitioner had been informed that the evidentiary portion of

10   the trial was about to begin.  (Id.)  The trial court then concluded voir dire and give preliminary

11   instructions to the jury.  Following opening statements, the prosecution called its first witness.

12   (RT at 178.)

13   The next morning, March 14, 2001, the bailiff told the court that he contacted

14   petitioner in the holding facility and asked him whether he was willing to dress for court.  (RT at

15   250.)  Petitioner responded that he had nothing to say.  (Id.)  The bailiff asked petitioner if he

16   wanted to attend court under the court rules.  (Id. at 250-51.)  Petitioner again responded that he

17   had nothing to say.  (Id.)  Petitioner then asked if it was time for him to testify.  (RT at 251.)  The

18   bailiff told petitioner that the defense case had not yet started.  (Id.)  The bailiff asked petitioner

19   if he wanted to testify.  (Id.)  Petitioner responded, "yes."  (Id.)  The bailiff then asked petitioner

20   if he wanted to talk to his attorney about it and petitioner said "no."  (Id.)

21   The trial court then discussed with trial counsel potential problems involving

22   petitioner testifying.  (RT at 254-56.)  The trial court was concerned about further outbursts and

23   inappropriate behavior by petitioner.  The trial court concluded that when it came time for

24   petitioner to testify, they would bring him to the courtroom and see how he was doing.  (RT at

25   257.)  The trial then resumed.

26   ////

1    The next morning, March 15, 2001, the bailiff told the court that petitioner again

2    responded, "I have nothing to say," when asked if he wanted to get dressed for court.  (RT at

3    352.)  At the beginning of the afternoon session on March 15, 2001, the bailiff told the court that

4    he had again asked petitioner if he wanted to come to court on the condition that he follow the

5    court's rules.  (RT at 437.)  Petitioner again responded, "No comment."  (Id.)

6    At the beginning of the next court day, March 19, 2001, petitioner was brought to

7    court.  Petitioner told the court that he needed to testify on his own behalf.  (RT at 519.)  The trial

8    court then attempted to discuss with petitioner the rules for testifying.  The trial court asked

9    petitioner if he wanted to be questioned by counsel or to testify in a narrative.  (RT at 520.)

10   Petitioner responded that he had no counsel.  (Id.)  The trial court then went on to explain to

11   petitioner that he would be cross-examined by the prosecution.  (RT at 521.)  Petitioner again

12   responded that he had no counsel.  (Id.)  The trial court then went on to explain other matters

13   regarding testifying to petitioner.  Petitioner repeatedly told the court that he had no counsel.

14   After further discussion, the jury was brought in.  (RT at 547.)  After petitioner

15   was sworn in, the trial court stated, "Mr. Spencer, if you'd like to go ahead and make the

16   statement regarding the facts and the evidence in the case regarding relevant admissible evidence,

17   go right ahead sir."  (RT at 548.)  Petitioner then greeted the jury and stated that he was filing a

18   Faretta motion.  (Id.)  The trial court then excused the jury.  (RT at 549.)  When asked if he

19   wanted to represent himself, petitioner stated that he wanted to file a declaration disqualifying the

20   trial court.  (RT at 550.)   The trial court reviewed the motion, responded to and then denied it.

21   (RT at 551-56, 559-66.)

22   Following a brief recess, the trial court took up petitioner's Faretta motion.  The

23   trial court denied the motion for the reasons stated herein:

24        Court: The Court would rule as follows, and I would cite People versus Horton,
          11 Cal.4th 1068, People versus Wyndam, a well known case in the area.
25        I would also–I would also cite People versus Hardy, 2 Cal.4th 86, and People
          versus Kirkpatrick K-I-R-K-patrick, 7 Cal.4th 988.

26

The court is going to deny the defendant's request for a self-representation.  I would cite the prior <u>Marsden</u> motions against the Public Defender's office, which is significant.

I would also note that the attorney presently before the Court, Mr. Foster, is a highly-regarded attorney in this legal community.  He, in the earlier <u>Marsden</u> motion filed against him, which I'm evidencing and considering as a pattern, has made numerous–in–in just the last two months, numerous visits with the defendant.

Petitioner: Let the record show, Your Honor–

Court: More so–I'm instructing the Court Reporter to disregard his comments.  Deputies, if you'll remove Mr. Spencer out of court.  Mr. Spencer, you're welcome to stay but you have to remain silent in court.

Petitioner: Your Honor, I have no counsel and I have filed the <u>Faretta</u> motion to represent myself, let the record show.

Court: Mr. Faretta (sic), if you wish to listen to what I have to say, you're welcome to stay.  But if you're going to interrupt me so I cannot make a ruling, you'll be removed.

Petitioner: Let the record show–

Court: Will you interrupt?

Petitioner:  –that I have filed a <u>Faretta</u> motion to represent me on my behalf.

Court: All right.  If you'll take him out of court so that I can complete my ruling.

****

The point I'm making with the two <u>Marsden</u> motions, that is apparent based on other conduct which I'll allude to in a moment that he is desirous of attempting to delay or continue or create error in the case by any means which are available to him.

I would note counsel has indicated a number of times when during the course prior to the trial that his client had intended to file the <u>Marsden</u> motion.  Mr. Foster advised both the prosecution and I that he was trying to meet with him through the weekend and that that was when his client first informed him that he wished to do that.

I would also note that Mr. Foster was retained, so that the record reflects that, was a retained counsel, and at some point funds ran out and the panel permitted Mr. Foster to continue.

The reason that's relevant is that Mr. Spencer could have fired at any time Mr. Foster by simply retaining another attorney, and that's a significant fact, that he's waited till this stage to conduct himself in the manner that he has.

17

1   I would also note that he has been extremely disruptive in his conduct in
    disrupting the process of the court, jury selection, just a moment prior to him
2   being removed from my physical presence so I could complete my ruling.  He
    talks over the Court and so the Court Reporter cannot hear what I am saying and
3   with the two people talking simultaneously so that we can have a – a record to
    reflect that.
4
    That being said, it is clear that he's not going to follow the Court's procedures and
5   rules and orders.  And in citing <u>People versus Horton</u>, I would note that if the
    Court were to grant him his pro per status, that it would not likely last for more
6   than a day without having that status being–a day would be probably too long,
    probably ten minutes when we bring the jury back in, before the Court would be
7   faced with a decision to revoke his status.

8   Moreover, I would also note that this defendant has voluntarily absented himself
    from the proceedings when I've made numerous efforts to invite him back, tried
9   to cajole him back and used staff and people that are very good at encouraging
    people not to use obstreperous behavior, and to no avail would he come back to
10  court.

11  So he is going to be playing his game in the sense of disrupting the proceedings
    and doing anything he can to inject error and I'm going to be faced with a
12  situation where he is, essentially having to bring Mr. Foster again.

13  The other point I want to make is since he has been voluntarily absent, he has not
    seen the People's case and, thus, would be unable to respond adequately to the
14  thrusts of the People's evidence, whereas Mr. Foster has been present and would
    be able to do that.
15
    In addition, in rejecting his request for pro per status, while orally made numerous
16  times during this inquiry and in what appeared–and I'm not confident at all that he
    was making a formal request earlier and during the jury voir dire process, he is not
17  willing to complete the Court's litany of requests and inquiries to grant the pro per
    status as is evidenced both now and earlier.  So I'm not satisfied that he truly
18  wishes to do that.

19  I would also consider that he wants a lengthy continuance at this stage of the
    proceedings when we are concluding evidence, that it would impermissibly in my
20  opinion delay the trial only to have it disrupted again should we return to court
    and that he would be seeking, in essence, to subpoena and bring in witnesses that
21  the Court in all likelihood could and had previously excluded, my ruling excluded,
    my ruling under the third party culpability issue.
22
    (Brief pause.)
23
    I would also note that his conduct in the holding tank with the deputies has
24  subjected him to lock down status and that his unwillingness to comply with the
    Sheriff's action or people down in the holding tank, he would not be able to use
25  phones, the law library and other matters because of his proclivity to disobey the
    rules and to force people to–in effect, passive resistance, force people to make him
26  comply, and, thus, he would not be able to adequately do the things that he

18

1    represented he wanted to do, that is, talk to the investigators, legal interns and
     other matters.
2
     For all of those reasons as well as other matters not alluded to by the Court, but
3    that are reflected in the record, the Court is denying him his pro per status.

4    Counsel, while it may seem redundant and arguably foolish on my part, it is my
     intent to give him one more shot in front of the jury and see if he will comply with
5    the Court's orders. Quite frankly, it's my opinion the charges are serious, he
     should have a chance to say his piece in front of a jury—
6
7    (RT at 570-74.)

8            Petitioner was then brought back into the courtroom. He told the trial court that

9    he wanted to be removed from the courtroom immediately after testifying. (RT at 578.)

10   Petitioner testified as follows herein:

11           Good morning, jurors. I apologize again for this inconvenience.

12   I am here this morning on my behalf to file a Faretta motion to make it to where
     that my case–I did not ask to come to trial yet 'cause I'm not prepared for trial.
13   My attorney here, that was my attorney. I terminate him as my attorney March the
     12th because He did was not forthcoming with the truth enably [sic] to represent
14   my case at that time.

15   (RT at 580.)

16           The trial court then interrupted petitioner and ordered him removed from court.

17   (RT at 580-81.) This was the end of the evidentiary portion of the trial. Based on petitioner's

18   request to leave the courtroom after testifying, he was not brought back to the courtroom during

19   closing arguments.

20           The following day, March 21, 2001, the bailiff asked petitioner if he wanted to be

21   present in the courtroom during reading of the jury instructions. (RT at 657.) Petitioner

22   responded that he had nothing to say unless he was able to testify. (Id.) The trial court then

23   proceeded to read the jury instructions.

24           On March 22, 2001, prior to the verdict being read, petitioner was brought to

25   court. (RT at 691.) After the following discussion with the trial court, petitioner was removed

26   from the court before the jury was brought in:

                                              19

Court: We'll go on the record.  Both counsel are present, Mr. Spencer is present. He asked to be present for the sentencing.

Petitioner: Your Honor, may I say something?

Court: No, you can't, Mr. Spencer.  I'm instructing you to remain silent. If you interrupt me or interrupt any of the proceedings I will have you immediately removed and I will cite, as the basis for that order, my prior warnings and cautions to you.

I spoke with the sergeant, and I have explained to both counsel the requests of the deputies.  Initially he was being transported belly chained and chained–

Petitioner: I have been treated unfairly at the—

Court: I am instructing the court reporter to disregard Mr. Spencer's comments and take down only–he's interrupting me, violating my orders.

I asked if he wanted to be dressed out.  He declined to be dressed out. He is in the jail clothing.  He is belly chained.  I have conferred with the sergeants regarding the belly chain, explained briefly the law.  He has been passive resistant and it's my understanding the reasons are due to disobedience and noncompliance with orders as opposed to physically assaulting anyone.

I have instructed them to remove the belly chains and I'll instruct the deputies now to remove the belly chains and physical restraints, and what I want is to have him free.

Mr. Spencer, I want you to listen.  If you speak out or you make any movements or rise from our chair–

Petitioner: I request to be removed from this courtroom.  This will be a mistrial. Can I be excused from this courtroom?

Court: Pursuant to his wish, he's removed.

(RT at 691-92.)

      The jury was then brought into the courtroom and the verdict was read.

      On April 19, 2001, petitioner was brought to court for sentencing.  At this hearing, petitioner told the trial court that he wanted to make a _Faretta_ motion.  (RT at 711.)  After questioning petitioner, the trial court granted the _Faretta_ motion.  (RT at 719.)

                    _Right to Be Present During Trial_

      The Sixth Amendment guarantee of a criminal defendant's right to be present at trial and other criminal proceedings against him can be waived.  _Taylor v. United States_, 414

20

1    U.S. 17, 20 (1973).  Such waiver must be voluntary, knowing, and intelligent.  Campbell v.

2    Wood, 18 F.3d 662, 671 (9th Cir. 1994).

3             A defendant also waives his right to be present at trial if, after being warned by

4    the court that disruptive conduct will result in removal from the courtroom, the defendant persists

5    in conduct that justifies exclusion from the courtroom.  Illinois v. Allen, 397 U.S. 337, 342-43

6    (1970) (trial judge has power to exclude disruptive defendant from trial after appropriate

7    warnings, on theory that defendant has waived Sixth Amendment rights).  Since "it is essential to

8    the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of

9    all court proceedings in our country[,]" Allen, 397 U.S. at 341, "a defendant can lose his right to

10   be present at trial if, after he has been warned by the judge that he will be removed if he

11   continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so

12   disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in

13   the courtroom." Id. at 343. "Once lost, the right to present can ... be reclaimed as soon as the

14   defendant is willing to conduct himself consistently with the decorum and respect inherent in the

15   concept of courts and judicial proceedings." Id.

16            As clearly reflected in the background section above, petitioner was repeatedly

17   disruptive and disorderly.  The trial court had good cause to remove petitioner from the

18   courtroom.  The trial court repeatedly advised petitioner of the behavior it reasonably expected

19   from him and granted him numerous opportunities to comply.  Petitioner voluntarily requested to

20   be removed from the courtroom before the verdict was read.  Under these circumstances,

21   petitioner can hardly complain that he was denied his right to be present during reading of the

22   verdict.

23            The trial court showed great patience with petitioner, even going so far as to be

24   willing to set up video cameras in another courtroom for petitioner to view the trial (an offer

25   petitioner declined).  The record reflects that petitioner waived his right to be present during the

26   trial by repeatedly engaging in disruptive behavior and, on occasion, by expressly waiving that

right.  Petitioner was not denied his right to be present during the trial.

After conducting an AEDPA review, the undersigned recommends that this claim be denied.

*Denial of Motion for Substitute Counsel*

While trial counsel was originally retained, he was later appointed through the Public Defender's office after petitioner ran out of money.  Denial of a motion pursuant to People v. Marsden, 2 Cal.3d 118 (1970), may implicate the Sixth Amendment right to counsel.  Schell v. Witek, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc).  Therefore, when a criminal defendant makes a request for substitution of counsel, the trial court is constitutionally required to inquire into the defendant's reasons for wanting a new attorney.  Schell, 218 F.3d at 1025 ("[I]t is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion, and that the matter be resolved on the merits before the case goes forward."); see also Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007) ("A trial court's inquiry regarding counsel's performance on a motion to substitute counsel should be such necessary inquiry as might ease the defendant's dissatisfaction, distrust and concern.") (citation and internal quotation marks omitted).  For an indigent defendant, such an inquiry can serve to protect against constitutional injury because the failure to provide substituted counsel "may result in a denial of the constitutional right to effective assistance of counsel if the defendant and his attorney are embroiled in an 'irreconcilable conflict.'"  United States v. Mills, 597 F.2d 693, 700 (9th Cir. 1979) (internal citations omitted).

In reviewing a federal habeas claim based on the denial of a substitution motion, "the ultimate constitutional question the federal courts must answer" is whether the state trial court's disposition of the motion violated a petitioner's constitutional rights because the conflict between the petitioner and appointed counsel "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  Schell, 218 F.3d at 1026.

1    If the reviewing court determines that a conflict developed between the petitioner and appointed

2    counsel so serious that it "resulted in the constructive denial of assistance of counsel, no further

3    showing of prejudice is required." Schell, 218 F.3d at 1027-28 (citing Strickland, 466 U.S. at

4    692). On the other hand, "not every conflict or disagreement between the defendant and counsel

5    implicates Sixth Amendment rights." Schell, 218 F.3d at 1027 (citing Morris v. Slappy, 461

6    U.S. 1, 13-14 (1983) (holding that the Sixth Amendment does not guarantee a "meaningful

7    relationship" between defendant and counsel)); see also Stenson, 504 F.3d at 886 ("An

8    irreconcilable conflict in violation of the Sixth Amendment occurs only where there is a

9    complete breakdown in communication between the attorney and client, and the breakdown

10   prevents effective assistance of counsel. Disagreements over strategic or tactical decisions do not

11   rise to [the] level of a complete breakdown in communication.")

12           As explained by the Ninth Circuit:

13           The test for determining whether the trial judge should have granted a substitution
             motion is the same as the test for determining whether an irreconcilable conflict
14           existed. The court must consider: (1) the extent of the conflict; (2) whether the
             trial judge made an appropriate inquiry into the extent of the conflict; and (3) the
15           timeliness of the motion to substitute counsel.

16   Daniels v. Woodford, 428 F.3d 1181, 1197-98 (9th Cir. 2005) (citations omitted).

17           A trial judge must also order a substitution of counsel if, after a hearing, the

18   defendant demonstrates the existence of "an actual conflict of interest." Jackson v. Ylst, 921 F.2d

19   882, 888 (1990).

20           Petitioner argues that the trial court improperly denied his motion for substitute

21   counsel made on March 12, 2001. As set forth in the background section above, the trial judge

22   made a thorough inquiry into petitioner's complaints regarding trial counsel. At the Marsden

23   hearing, trial counsel addressed all of petitioner's complaints. Trial counsel stated that he had

24   not told petitioner that the charges regarding the 1998 firebombing incident would be dropped,

25   contradicting petitioner's claim that he had made such a statement. Trial counsel stated that Nora

26   Savage had been subpoenaed in response to petitioner's claim that she had not been subpoenaed.

1   Trial counsel also discussed his attempts to investigate the third-party culpability issue, which

2   petitioner claimed had not been adequately investigated.  Finally, counsel identified eleven

3   occasions he had discussed the case with petitioner in response to petitioner's claim that he had

4   not adequately discussed the case with him.  Counsel also told the court that despite the problems

5   in his relationship with petitioner, he believed he could continue to adequately represent him.

6          While petitioner and his counsel had some conflict, it is clear from the record that

7   petitioner most likely would have had a conflict with any lawyer appointed to represent him.  The

8   conflict between petitioner and his counsel did not prevent counsel from continuing to effectively

9   represent petitioner during the trial.[4]

10          For the reasons discussed above, the undersigned finds that the trial court properly

11  denied petitioner's motion for substitute counsel.  After conducting an AEDPA review, the

12  undersigned finds that the denial of this claim was not an unreasonable application of clearly

13  established Supreme Court authority.  Accordingly, this claim should be denied.

14                    *Denial of Motions for Self-Representation*

15          The Sixth Amendment affords every criminal defendant the right to

16  self-representation.  Faretta v. California, 422 U.S. 806 (1975).  In order to exercise this right, a

17  defendant's request for self-representation must be unequivocal.  Sandoval v. Calderon, 241 F.3d

18  765, 774 (9th Cir. 2000).  Moreover, assertion of the right must be timely and must not be for the

19  purpose of delay.  Id.  In Faretta, the Supreme Court clearly established that a Faretta request

20  made "weeks before trial" is timely.  Marshall v. Taylor, 395 F.3d 1058, 1061 at n. 14 (9th Cir.

21  2005)(citation omitted).  However, the Supreme Court has not otherwise clearly established

22  when a Faretta request is untimely.  Marshall, 395 F.3d at 1061.  Accordingly, other courts are

23  free to assess when a motion is untimely so as long as their standards comport with the Supreme

24

25          [4]  Petitioner later told the court that he was in the process of trying to hire new counsel.
    (RT at 141.)  Petitioner's responses to the trial court's questions regarding how he would pay for
    that counsel were evasive.  (RT at 141-42.)  Moreover, at the time of the Marsden motion,
26  petitioner did not suggest that he was seeking a continuance in order to hire counsel.

1   Court's holding that a request 'weeks before trial' is timely.  Marshall, 395 F.3d at 1060-61.

2   　　　　Petitioner's first Faretta motion was made on the day that jury selection was to

3   begin.  In essence, the trial court denied the motion as untimely after finding that it would not

4   grant petitioner's motion for a continuance to prepare for trial.  In Marshall, the Ninth Circuit

5   found that the trial court's decision that the petitioner's motion for self-representation made on

6   the morning of trial was untimely was not objectively unreasonable.  In Stenson v. Lambert, 504

7   F.3d 873, 882, 884 (9th Cir. 2007), the Ninth Circuit found that the trial court's decision that the

8   motion for self-representation made during voir dire and "on the verge of jury impanelment" was

9   untimely was not objectively unreasonable.

10   　　　　While petitioner's first Faretta motion was made just before voir dire was to

11   begin, the California Supreme Court's finding that this request was untimely was not an

12   unreasonable application of the Supreme Court's holding that a request made "weeks before

13   trial" was timely.

14   　　　　Petitioner made his second Faretta motion during the defense case.  The trial court

15   denied this motion on grounds that it was untimely and made for purposes of delay.  Based on the

16   standards set forth above, the motion was clearly untimely.  For the reasons stated by the trial

17   court, the motion was also made for purposes of delay.  Accordingly, the trial court properly

18   denied petitioner's second Faretta motion.

19   　　　　After conducting an AEDPA review, the undersigned finds that the denial of this

20   claim by the California Supreme Court was not an unreasonable application of clearly established

21   Supreme Court authority.  Accordingly, this claim should be denied.

22   　　　　B.  Photograph

23   　　　　Petitioner argues that his constitutional rights were violated because he was forced

24   to appear before the jury in a photograph dressed in orange jail clothing.  The background to this

25   ////

26   ////

1    claim is as follows.[5]

2        Because petitioner waived his right to attend the trial, as discussed above, the

3    prosecution had a deputy sheriff take a photograph of petitioner so that identity could be

4    established. (RT at 234; 252-53.) Deputy Burrow testified that he took the photograph. (RT at

5    178-79.) Kathleen Krouskop identified petitioner by this photograph, People's Exhibit 10-B.

6    (RT at 180.) While the record does not contain this photograph, it is described in the exhibit list

7    as a "color polaroid photo of black male with mustache, wearing glasses and orange jail clothes."

8    (Clerk's Transcript ("CT") at 200.)

9        A defendant may not be compelled to be tried before a jury in identifiable prison

10   clothes. Estelle v. Williams, 425 U.S. 501, 512 (1976). In the instant case, petitioner was not

11   compelled to wear the jail clothes. Petitioner was given the option to attend his trial wearing

12   civilian clothing on several occasions. Petitioner refused these options. In his statement

13   describing the taking of the photograph, Deputy Burrow did not state that he offered to let

14   petitioner put on civilian clothing for the photograph. (RT at 252-53.) However, when Deputy

15   Burrow asked petitioner if he could take his photograph, petitioner responded that he was "not

16   doing nothing." (RT at 252.) Deputy Burrow and several other officers were then forced to put

17   petitioner in handcuffs in order to take the photographs. (RT at 253.)

18       Petitioner made clear to Deputy Burrow that he would not cooperate with any

19   attempt to take his photograph. Therefore, it is clear that petitioner would not have been willing

20   to put on civilian clothing for the photograph had the option been given to him.

21       Under the circumstances described above, petitioner cannot claim that he was

22   compelled to appear before the jury wearing jail clothing. He made that choice himself.

23       After conducting an AEDPA review, the undersigned recommends that this claim

24   be denied.

25

26       [5] Petitioner also suggests that excessive force was used to take the photograph. Such a
     claim for excessive force is not properly raised in a habeas corpus petition.

C.  Denial of Right to Present Witnesses

Petitioner argues that he was denied his right to present witnesses regarding his third-party culpability defense.  The undersigned construes this is as a claim for denial of the right to present a defense.  The opinion of the California Court of Appeal accurately summarizes the background to this claim:

Separately, the defense sought to present evidence at trial that might suggest a different perpetrator of the 1998 fire. The defense offered the testimony of Martin, then Spurgeon Holloway's daughter-in-law living in the house at the time of the arson. Martin testified at a hearing outside the presence of the jury that she had had a sexual encounter with a coworker, Clement Williams, which was discovered by Williams's girlfriend, Tracy Wallace. Wallace made threatening telephone calls to Martin at work the day before the arson (saying that she was going to "kick [her] a-" and hurt her) and a gloating telephone call to her after the arson ("How does it feel to have your house full of smoke?"). Martin testified that Wallace stole her purse after the fire and told her that she then knew where she lived. Although Martin told the arson investigator about the threatening calls in 1998, she could not remember Wallace's last name. Martin was interviewed at the time of the 1998 incident by the same arson investigator who investigated the 2000 incident.

After Wallace was located by the defense during trial, defense counsel reported that Wallace had told defense investigators that she had not known of the fire at the Holloway house until defense investigators had told her about it.

The trial court reviewed the taped interviews with Wallace and ultimately ruled that a presentation of Martin's testimony would unduly consume time and confuse and mislead the jury. It therefore excluded the testimony under section 352.

(Respondent's Lodged Document 4, pp. 7-8.)

The California Court of Appeal denied this claim for the reasons stated herein:

Defendant argues that the exclusion of evidence that a third party had a motive and opportunity to commit the 1998 arson deprived him of his due process right to a fair trial. As noted earlier, defendant sought to present evidence that on the day prior to the 1998 arson, Tracy Wallace threatened Renee Martin, who also lived in the house targeted by the arson. Defendant argues that this evidence met the requirements for the admission of third-party culpability evidence set forth in People v. Hall (1986) 41 Cal.3d 826 (Hall).

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.... [E]vidence of mere motive or opportunity to commit

the crime [by] another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (Hall, supra, 41 Cal.3d at p. 833.)

"[C]ourts should simply treat third-party culpability evidence like any other evidence: [I]f relevant[,] it is admissible [citation] unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion [citation]." (Hall, supra, 41 Cal.3d at p. 834.)

A trial court's discretionary ruling under section 352 will not be disturbed on appeal absent an abuse of discretion. (People v. Lewis (2001) 26 Cal.4th 334, 372; People v. Alvarez (1996) 14 Cal.4th 155.)

The trial court gave the defense ample opportunity to produce evidence that a third party had anything beyond a motive to commit the 1998 firebombing. The court permitted Martin to testify outside of the jury's presence and used law enforcement sources to locate Wallace, the purportedly guilty third party. After Wallace was located, the trial court also reviewed the substance of the defense investigator's interview with Wallace and described its contents for the record. And after a full hearing and numerous postponements of its ruling, and after reminding the defense that any additional witnesses could still be produced, the court properly found that the testimony was inadmissible under section 352 because it would mislead and confuse the jury. We hold that the court did not abuse its discretion.

Defendant argues that the evidence "constituted much more than a demonstration of mere motive or opportunity on the part of Ms. Wallace.... In addition, ... Ms. Wallace actually threatened Ms. Martin with bodily harm several times, made these threatening calls to both Ms. Martin's home and work phone numbers, boldly confronted Ms. Martin at her workplace, and stole Ms. Martin's purse. Perhaps most importantly, Ms. Wallace threatened Ms. Martin with bodily harm just hours prior to the house fire. Finally, the day after the fire occurred, Ms. Wallace called Ms. Martin to ask her how it felt to 'have her house full of smoke.'"

But except for the threatening calls-which were, as the trial court said, "more of a taunt"-Martin's testimony did not link Wallace to the actual perpetration of the 1998 crime, as required by Hall, supra, 41 Cal.3d 826. "[E]vidence of mere motive or opportunity to commit the crime [by] another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt." (Id. at p. 833.) But Martin's testimony at the motion in limine effectively precluded an opportunity for Wallace to hurl a firebomb through a window at Martin's residence because it established that Wallace did not know where Martin lived before the fire: Wallace's threatening calls to Martin on the day before the fire were made to Martin's office. Wallace stole Martin's purse after the fire and then called Martin to gloat that she now knew where Martin lived. And Martin was very clear that Wallace did not call her to gloat about the fire until after Martin had appeared on the television news in front of her burned home. Defendant's scenario that Wallace threw a Molotov cocktail at Martin's home was inconsistent with Wallace's taunt that once she got Martin's purse, she now had Martin's

28

1   address.

2   Defendant suggests that the trial court made "a credibility determination that the
    evidence did not truly link Ms. Wallace to the fire" and thereby "invaded the
3   province of the jury." But the trial court did not make a mere credibility
    determination. It merely determined that Martin's testimony suggested that
4   Wallace did not have Martin's home address and that the probative value of the
    evidence of the threats to Martin at her office were outweighed by the risk that the
5   evidence would mislead and confuse the jury.

6   Indeed, trial counsel's report to the trial court of his investigator's interview of
    Wallace effectively eliminated her as an effective defense witness: Wallace stated
7   that the first time that she learned of the fire in Martin's house was when the
    defense investigator told her about it. She denied taking Martin's purse or
8   knowing what she looked like.

9   Faced with dwindling evidence that might inculpate a third party in the 1998
    arson, the trial court properly exercised its discretion under section 352.
10  Defendant could only show a motive but not an opportunity to commit the crime
    in light of the evidence that Wallace did not have Martin's address.

11
    And even if we concluded that error had occurred, there was no miscarriage of
12  justice. (Hall, supra, 41 Cal.3d at p. 836; People v. Watson (1956) 46 Cal.2d 818,
    836.)  The evidence in support of the judgment - namely, the clear evidence
13  linking defendant with the 2000 arson against Krouskop and the distinctive
    similarities between that arson and the 1998 arson in terms of the device (a
14  Molotov cocktail), motive (retaliation), timing (after a breakup with the victim),
    and victim - was frankly compelling. An effort to cast blame on a third party, in
15  the face of evidence that the third party did not even know Martin's address before
    the fire, would not have affected the outcome of the case.

16

17  (Respondent's Lodged Document 4, pp. 17-21.)

18          Due process includes a right to "'a meaningful opportunity to present a complete

19  defense.'"  Crane v. Kentucky, 476 U.S. 683, 690 (1986), citing California v. Trombetta, 467

20  U.S. 479, 485 (1984).  That constitutional right is violated by the exclusion of probative

21  admissible evidence that another person may have committed the crime.  Chambers v.

22  Mississippi, 410 U.S. 284, 302-03 (1973).  However, the Constitution permits judges to exclude

23  evidence that is repetitive, only marginally relevant or poses an undue risk of harassment or

24  prejudice.  Holmes v. South Carolina, 547 U.S. 319, 326 (2006).

25          To merit habeas relief, a petitioner must show that the trial court's exclusion of the

26  evidence was so prejudicial that it violated his due process rights.  Brecht v. Abrahamson, 507

U.S. 619, 637 (1993).  That is, the trial error must have had a "substantial and injurious effect or influence in determining the jury's verdict."  Id.; see also Fry v. Pliler, 551 U.S. 112, 120 (2007) (harmless error standard applied in federal habeas review of trial-type errors).

After reviewing the record, the undersigned finds that the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.  While Tracy Wallace may have had motive to harm Renee Martin after she discovered her having an affair with her boyfriend, the evidence linking Wallace to the fire was weak.  At the pretrial hearing, Renee Martin testified that when she drove home from work the night after Wallace discovered the affair, she checked at least seven times and saw no one following her.  (RT at 83.)   After the fire, Martin was interviewed by a television station.  (RT at 87.)   Martin later saw herself on television.  (RT at 88.)   After she saw herself on television, Martin received a phone call from Wallace during which Wallace said "how does it feel to have your house full of smoke."  (RT at 89.)   A few days after the fire, Wallace came to Martin's work place.  (RT at 90.)  Martin saw Wallace go into the office.  (RT at 91.)  Martin then ran downstairs to call the police.  (Id.)  When Martin returned, she noticed that her purse was gone from the office.  (Id.)  By this time, Wallace was gone.  (Id.)  A day later, Wallace called Martin and said that she had her purse and knew where she lived.  (RT at 92.)

Martin testified that she later learned that an officer at her job gave Wallace her (Martin's) telephone number.  (RT at 95-96.)

When petitioner's investigator later contacted Wallace, she told the investigator that she first learned about the fire from the investigator, not from the television story.  (RT at 153-54.)  However, she also denied taking Martin's purse.  (RT at 154.)

Based on Martin's testimony, it appears that Wallace learned of her address after the fire when she took Martin's purse from the office.  There is no direct evidence that Wallace knew where Martin lived before the fire.  While Wallace called Martin the day after the fire and said "how does it feel to have your house full of smoke," she most likely became aware of the

fire after seeing Martin interviewed on television, although she denied having seen the television

report to the defense investigator.

Because the third-party defense evidence was weak, the trial court did not err in

excluding it on grounds that it would only confuse the jury.  Moreover, even if the trial court

should have allowed petitioner to present this evidence, it is unlikely that the outcome of the trial

would have been different had the evidence been presented.  The evidence linking petitioner to

the fires was strong whereas the evidence linking Wallace was weak.  Petitioner would still have

been found guilty even if the evidence discussed above had been presented.

The denial of this claim by the California Court of Appeal was not an

unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

should be denied.

D.  <u>Trial Court Erred in Admitting Evidence of Uncharged Conduct</u>

Petitioner argues that the trial court in admitting evidence of his uncharged

conduct.  The background to this claim is accurately summarized by the California Court of

Appeal:

> Counts 1, 2, and 3 charged defendant with the premeditated attempted murder of
> Krouskop, arson of her apartment, and ignition of a destructive device on July 17,
> 2000. Counts 4, 5, and 6 charged defendant with the attempted murder of
> Krouskop, arson of the house in which she was residing, and ignition of a
> destructive device on November 4, 1998.
>
> Before trial, the prosecution sought admission of the evidence of the uncharged
> 1996 fire of Krouskop's car in order to prove "identity, intent, motive, absence of
> mistake, and common plan or scheme" under section 1101, subdivision (b).FN4
> The prosecution also sought to admit the 1996 fire as a prior incident of domestic
> violence pursuant to section 1109, subdivision (b).FN5
>
>> FN4. Section 1101, subdivision (b), provides in relevant part: "Nothing in
>> this section prohibits the admission of evidence that a person committed a
>> crime, civil wrong, or other act when relevant to prove some fact (such as
>> motive, opportunity, intent, preparation, plan, knowledge, identity,
>> absence of mistake or accident ... ) other than his or her disposition to
>> commit such an act."
>>
>> FN5. Section 1109, subdivision (a)(1), provides in relevant part: "Except
>> as provided in subdivision (e) or (f), in a criminal action in which the

1    defendant is accused of an offense involving domestic violence, evidence
     of the defendant's commission of other domestic violence is not made
2    inadmissible by Section 1101 if the evidence is not inadmissible pursuant
     to Section 352."

3

4    The trial court found similarities between the uncharged and charged fires based
     on the facts that the incidents involved the same victim and that each fire erupted
5    not long after the victim severed her relationship with the defendant. The trial
     court found that the evidence of the 1996 offense was therefore admissible under
6    section 1101, subdivision (b), because it showed the "intent and circumstances"
     and "a pattern ... if believed by a jury." The trial court also found the evidence
7    admissible under section 1109, as an attempt to injure the victim directly or to
     place her in reasonable apprehension of serious bodily injury. Finally, the court
8    found that the probative value of the evidence outweighed the possible prejudice.

9    Although the trial court did not mention that the 1996 incident would be
     admissible to show identity, the prosecution's written motion and argument sought
10   its admission on that theory. And after hearing testimony of the victim at trial, the
     trial court agreed: "[T]he circumstances of the firebombings ... have a fingerprint
11   in the matter in which they occur involving the victim. They were-they all occur
     late night, with little notice after a recent break up [ sic ] with the victim and the
12   defendant, and there's a clear pattern of identity ... pinpointing back to the victim."

13   Evidence of the 1996 uncharged arson of Krouskop's car was presented through
     the testimony of Krouskop, witness Ciraolo, and arson investigator George
14   McKinnon.

15   (Respondent's Lodged Document 4, pp. 6-7).

16        The California Court of Appeal denied this claim for reasons stated herein:

17   Defendant argues that the admission of the evidence of the 1996 car fire violated
     his state and federal constitutional rights to due process. Defendant contends that
18   the evidence was inadmissible under section 1101, subdivision (b), and section
     1109 and "was far more prejudicial than probative."
19
     Because the evidence was found to be admissible under both sections, we must
20   find it inadmissible under both sections in order to find error. (People v. Branch
     (2001) 91 Cal.App.4th 274, 280-281.) We conclude that the evidence was
21   properly admissible under section 1101, subdivision (b), and thus we need not
     reach whether it was admissible under section 1109.
22
     We review the admission of evidence under sections 1101, subdivision (b), and
23   352 under the abuse of discretion standard. (People v. Kipp (1998) 18 Cal.4th
     349, 369 [§ 1101]; People v. Rodrigues (1994) 8 Cal.4th 1060, 1124 [§ 352].) The
24   trial court's decision should not be disturbed on appeal unless the trial court acted
     in an arbitrary, capricious, or patently absurd manner that resulted in a manifest
25   miscarriage of justice. (People v. Rodrigues, supra, 8 Cal.4th at pp. 1124-1125.)

26

32

Section 1101, subdivision (a), prohibits the introduction of evidence of a defendant's character, including in the form of evidence of his prior offenses, in order to prove his conduct on a specified occasion. (See People v. Kipp, supra, 18 Cal.4th at p. 369.) Subdivision (b) of section 1101 allows, however, the admission of a crime, civil wrong, or other act to prove a fact other than disposition, such as motive, intent, plan, or identity.FN6

FN6. See footnote 4, ante.

"To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses.... [¶] ... [¶] A lesser degree of similarity is required to establish relevance on the issue of common design or plan. [Citation.] For this purpose, 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' [Citation.] ... [¶] The least degree of similarity is required to establish relevance on the issue of intent. [Citation.] For this purpose, the uncharged crimes need only be 'sufficiently similar [to the charged offenses] to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" (People v. Kipp, supra, 18 Cal.4th at pp. 369-371, bracketed text in original; see also People v. Carpenter (1997) 15 Cal.4th 312, 379.)

Defendant argues that "the car fire evidence could not have been probative of the issue of intent on [the attempted murder and destructive device with intent to murder] counts because the car fire obviously did not involve intent to murder." And although he concedes that "evidence of uncharged conduct, such as the car fire, may have been admissible as to the issue of a defendant's intent with regard to a charged offense of arson of a structure," he argues that the admission of evidence of the 1996 car fire was unnecessary because "[t]he issue of intent as to these counts was undisputed." He reasons that "whoever threw the 'Molotov cocktails' into the respective homes ... did so willfully and maliciously."

However, since defendant did not concede his intent to commit arson, evidence that he threw the "Molotov cocktail" willfully and maliciously, as required by the arson statute (Pen.Code, § 451), that is, with a purpose to commit the act and with a wish to vex, annoy, or injure another person or intent to do a wrongful act (Pen.Code, § 7, subds.(1), (4)), was relevant. And the 1996 fire of the victim's car, if the jury found that defendant caused it, was relevant to show an intent to vex, annoy, or injure his girlfriend each time that they broke up.

More importantly, the evidence of the 1996 fire showed motive and thus identity: The distinctive thread and unchanging timing running through the uncharged and charged offenses - a fire targeted at the same victim following her leaving the defendant, thereby angering him - demonstrated a common motive associated with each of the fires, which helped identify defendant as the perpetrator. In short, the uncharged arson - in light of the nature of the crime, the identity of the same victim, and the same motive and timing - was "highly similar to the charged offenses" (People v. Kipp, supra, 18 Cal.4th at p. 369) and was thus probative of the conclusion that the same person had perpetrated all three offenses.

True, it is unusual to use an uncharged act, for which the perpetrator's identity is unclear, to prove the identity of the perpetrator of two charged crimes for which the evidence of the perpetrator's identity is stronger. But if the evidence of the uncharged crime has a "tendency in reason to prove" FN7 identity, it is, by definition, relevant and admissible under section 1101, subdivision (b).

> FN7. The Evidence Code defines relevance as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)

And in this case, the common features of the three arsons help to point to the one person who had the same motive for each fire and who was clearly responsible for the last one: the defendant. The evidence clearly linked defendant to the last arson in 2000, which was directed at Krouskop's bedroom. First, the cloth in the "Molotov cocktail" was similar to dish towels that Krouskop had bought with defendant, the remains of which towels were found in defendant's apartment. Second, defendant's fingerprints were found on one of the three partly unscrewed bulbs near Krouskop's apartment, which had no other purpose but to avoid illumination on the night of the arson. Third, one of the bags outside Krouskop's apartment matched bags that defendant kept in his apartment.

The prior arson in 1998, however, offered less direct evidence of defendant's involvement. Krouskop had moved to Holloway's house only days before the arson, but found notes on defendant's calendar containing Holloway's address and a real estate printout of Holloway's house and address. But the same motive and triggering event existed for that arson as the arson that defendant had clearly perpetrated in 2000 - anger at the recent breakup. Indeed, defendant had asked Krouskop to come back to him the very night of the 1998 arson, she had refused, and he had cut up her clothes in apparent anger.

The uncharged, 1996 arson of Krouskop's car, which immediately followed Krouskop's breakup with defendant, completed the pattern of similarly timed fires. The recurrence in three separate cases of the same crime (arson) directed at the same victim (Krouskop) following the same event (a breakup between defendant and the victim) was probative of the fact that the same person who was responsible for the 2000 arson was also responsible for the 1998 arson. The coincidences of the same victim being subjected to three arsons each time she left defendant were too great to be a mere coincidence. Accordingly, the evidence of the 1996 fire was relevant under section 1101, subdivision (b), to prove identity. (People v. Linkenauge (1995) 32 Cal.App.4th 1603, 1613.)

In People v. Green (1983) 146 Cal.App.3d 369 at page 376 (Green), the Court of Appeal observed that "'[w]hen ... a primary issue of fact is whether the defendant -rather than some other person -committed the charged offense, evidence of uncharged offenses is ordinarily admissible if it discloses a distinctive modus operandi common both to the charged and uncharged offenses ....'" In Green, the court found a prior arson of defendant's estranged wife's apartment admissible as evidence for another fire in the wife's apartment. The Court of Appeal concluded that the trial court had correctly found strong unifying factors between the two incidents based on the facts that the wife's apartment was targeted by both fires,

34

that both fires were deliberately set, that a flammable liquid had been used, and that the defendant was in the area when the fires broke out. (Id. at p. 377.)

Here, too, there were strong unifying factors among the three fires, like Green: the same victim, deliberately set fires, instigated by the same type of event, and based on the same motive. Accordingly, the evidence was relevant under section 1101, subdivision (b).

However, "[t]here is an additional requirement for the admissibility of evidence of uncharged crimes: The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (People v. Kipp, supra, 18 Cal.4th at p. 371.) This standard, of course, is codified in section 352.FN8

> FN8. Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

In People v. Harris (1998) 60 Cal.App.4th 727, we identified five areas of inquiry pertinent to a section 352 analysis: (1) the inflammatory nature of the evidence of the prior acts; (2) the probability of resulting confusion among the jurors; (3) the remoteness of the prior acts; (4) whether admission of the evidence will involve an undue consumption of time; and (5) the probative value of the evidence. (Id. at pp. 737-740.) We noted, "The two crucial components of section 352 are 'discretion,' because the trial court's resolution of such matters is entitled to deference, and 'undue prejudice,' because the ultimate object of the section 352 weighing process is a fair trial." (Id. at p. 736.)

In this case, addressing the first Harris factor (the inflammatory nature of the evidence), the car fire in 1996 was less dramatic and less serious than the two incidents of attempted murder targeting the victim's residence at night. Addressing the second factor (the probability of confusion), the evidence of the 1996 car fire was straightforward and did not risk any confusion on the part of the jury. Third, the 1996 car fire was not particularly remote from the two arsons in 1998 and 2000. Fourth, evidence of the uncharged offense was not time-consuming. In fact, virtually the same witnesses were used as for the charged offenses. Fifth, the risk of prejudice from admission of the car fire was minimal.

Defendant argues that the prejudice was great because "the connection between [defendant] and the car fire was speculative, at best." But the jury was instructed that it could not consider the uncharged act "for any purpose" unless it found by a preponderance of the evidence that defendant committed that act. (CALJIC No. 2.50) If the jury found that he did, the evidence of the 1996 car fire was relevant and not inflammatory or otherwise prejudicial. After all, "'[t]he 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.'" (People v. Coddington (2000) 23 Cal.4th 529, 588, overruled on another ground in Price v.. Superior Court (2001) 25 Cal.4th

1046, 1069, fn. 13.) If the jury found defendant committed the 1996 car fire, the evidence was relevant and did not tend to evoke an emotional bias. Accordingly, the 1996 uncharged act was admissible.FN9

> FN9. We note that the trial court also cautioned the jury that all counts had to be considered separately: "Each count charges a distinct crime. You must decide each count separately. The defendant may be found guilty or not guilty of any or all of the crimes charged. Your finding as to each count must be stated in a separate verdict." (CALJIC No. 17.02; People v. Catlin (2001) 26 Cal.4th 81, 153.)

(Respondent's Lodged Document 4, pp. 9-17.)

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing a specific federal constitutional provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. Pulley v. Harris, 465 U.S. 37, 41 (1984). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. Romano v. Oklahoma, 512 U.S. 1, 12-13 (1994). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir.1991).

Although the evidence of the prior uncharged arson "offered less direct evidence" of petitioner's involvement, as noted by the California Court of Appeal, there were permissible inferences the jury could draw from this conduct evidence. All three arsons involved the same crime directed at Krouskop after she and petitioner broke up. As noted by the California Court of Appeal, "[t]he coincidences of the same victim being subjected to three arsons each time she left defendant were too great to be a mere coincidence." (Respondent's Lodged Document 4, pp. 13-14.) For that reason, evidence of the uncharged arson was relevant to prove identity.

Even assuming the trial court erred in admitting evidence of the uncharged arson, petitioner is not entitled to habeas relief because admission of this evidence did not have a "substantial and injurious effect on the jury's verdict." Plascencia v. Alameida, 467 F.3d 1190, 1203 (9th Cir. 2006) (applying Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), harmless error

1  analysis to claim that admission of evidence was improper).  Had the jury not heard the evidence

2  of the prior uncharged arson, it is highly unlikely that the outcome of the trial would have been

3  different.  Without this evidence, the jury had sufficient evidence on which to convict petitioner

4  of the charged offenses.  For example, evidence was presented that one of the Molotov cocktails

5  had a towel stuck in it that Krouskop testified she and petitioner had bought together.  The

6  remains of this towel were later found in petitioner's apartment.

7         The denial of this claim by the California Court of Appeal was not an

8  unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

9  should be denied.

10               E.  Ineffective Assistance of Counsel

11               *Legal Standard*

12         The test for demonstrating ineffective assistance of counsel is set forth in

13  Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

14  all the circumstances, counsel's performance fell below an objective standard of reasonableness.

15  Id. at 688.  To this end, the petitioner must identify the acts or omissions that are alleged not to

16  have been the result of reasonable professional judgment.  Id. at 690.  The federal court must then

17  determine whether in light of all the circumstances, the identified acts or omissions were outside

18  the wide range of professional competent assistance.  Id.  "We strongly presume that counsel's

19  conduct was within the wide range of reasonable assistance, and that he exercised acceptable

20  professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702

21  (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

22         Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

23  693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

24  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

25  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

26         In extraordinary cases, ineffective assistance of counsel claims are evaluated

based on a fundamental fairness standard.  <u>Williams v. Taylor</u> , 529 U.S. 362, 391-93 (2000),

(citing <u>Lockhart v. Fretwell</u>, 506 U.S. 364 (1993)).

> The Supreme Court has emphasized the importance of giving deference
> to trial counsel's decisions, especially in the AEDPA context:

> > In <u>Strickland</u> we said that "[j]udicial scrutiny of a counsel's
> > performance must be highly deferential" and that "every effort
> > [must] be made to eliminate the distorting effects of hindsight, to
> > reconstruct the circumstances of counsel's challenged conduct, and
> > to evaluate the conduct from counsel's perspective at the time."
> > 466 U.S. at 689.  Thus, even when a court is presented with an
> > ineffective-assistance claim not subject to § 2254(d)(1) deference,
> > a [petitioner] must overcome the "presumption that, under the
> > circumstances, the challenged action 'might be considered sound
> > trial strategy.'"  <u>Ibid</u>. (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91,
> > 101 (1955)).

> > For [petitioner] to succeed, however, he must do more than show
> > that he would have satisfied <u>Strickland's</u> test if his claim were
> > being analyzed in the first instance, because under § 2254(d)(1), it
> > is not enough to convince a federal habeas court that, in its
> > independent judgment, the state-court decision applied <u>Strickland</u>
> > incorrectly.  <u>See Williams</u>, <u>supra</u>, at 411.[6] Rather, he must show
> > that the [ ]Court of Appeals applied <u>Strickland</u> to the facts of his
> > case in an objectively unreasonable manner.

<u>Bell v. Cone</u>, 535 U.S. 685, 698-99 (2002).

> *Failure to Call Fingerprint and Arson Experts*

> Petitioner allege that trial counsel was ineffective for failing to call a fingerprint
expert to challenge the prosecution's fingerprint evidence and for failing to call an arson expert.
(Dkt. 1, pp. 13-14 of 97.)

> Regarding the fingerprint evidence, as discussed above, a maintenance man
testified that during the morning of the 2000 incident, he found that three light bulbs in the
carport near Krouskop's apartment were out.  (RT at 298.)  Upon closer inspection, he found that
they were just loose.  (<u>Id</u>.)  He screwed them back in and they worked.  (<u>Id</u>.)  Peggy Hummel, a

---

[6]  This internal citation should be corrected to <u>Williams v. Kaiser</u>, 323 U.S. 471, 477
(1945).

1   fingerprint expert, testified that she found a fingerprint matching petitioner's right middle finger

2   on one of the lightbulbs. (RT at 497-500.)

3            Petitioner has provided no evidence demonstrating what a fingerprint expert

4   called on behalf of the defense would have testified to.  Under these circumstances, his claim that

5   trial counsel was ineffective for failing to call a fingerprint expert is vague and speculative.

6   Petitioner has not established that counsel was unreasonable for failing to call a fingerprint

7   expert, and nor has petitioner shown that he was prejudiced as a result.  See James v. Borg, 24

8   F.3d 20, 26 (9th Cir. 1994) (rejecting ineffective assistance of counsel claim and stating,

9   "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant

10  habeas relief").

11           Petitioner's claim that counsel was ineffective for failing to call an arson expert is

12  also vague and speculative.  Petitioner has provided no evidence regarding what such a witness

13  would have testified to.  Petitioner has not established that counsel was unreasonable for failing

14  to call an arson expert, and nor has petitioner shown that he was prejudiced as a result.

15           After conducting an AEDPA review, the undersigned finds that the denial of this

16  claim by the California Supreme Court was not an unreasonable application of clearly established

17  Supreme Court authority.

18                    *Failing to File Motion to Suppress*

19           Petitioner alleges that trial counsel was ineffective for failing to file a motion to

20  suppress on grounds that the search warrant was not supported by probable cause.  (Dkt. 1, p.

21  14.)  A copy of the warrant is attached to the petition as exhibit D.  (Dkt. 1, p. 95.)  The warrant

22  was obtained based on a statement made to the police by victim Krouskop.  (RT at 399.)

23           Petitioner has not demonstrated the grounds on which trial counsel should have

24  challenged the search warrant.  Petitioner has not shown, for instance, that Krouskop's statement

25  was insufficient to support the warrant.  For these reasons, the undersigned finds that petitioner

26  has not demonstrated that counsel was ineffective for failing to file a motion to suppress the

1  search warrant.

2         After conducting an AEDPA review, the undersigned finds that the denial of this

3  claim by the California Supreme Court was not an unreasonable application of clearly established

4  Supreme Court authority.

5         *Bias*

6         Petitioner alleges that trial counsel was biased and prejudiced against him.  (Dkt.

7  1, p. 15.)  In support of this claim, petitioner cites pages 54, 73, 131, 133 and 135, presumably of

8  the reporter's transcript.  (Id.)  The undersigned has carefully reviewed the record and finds no

9  evidence that trial counsel was biased or prejudiced against petitioner.

10        After conducting an AEDPA review, the undersigned finds that the denial of this

11 claim by the California Supreme Court was not an unreasonable application of clearly established

12 Supreme Court authority.

13        *Failure to Object*

14        Petitioner argues that trial counsel was ineffective for failing to object to the

15 prosecutor's repeated reference to the uncharged act.  (Dkt. 1, p. 15.)   As noted by respondent in

16 the answer, trial counsel objected to the introduction of evidence regarding the uncharged 1996

17 incident.  (RT at 25-26.)  Because trial counsel objected to admission of this evidence, the

18 grounds of this claim are unclear.  Because this claim is vague and unsupported, it should be

19 denied.  James v. Borg, 24 F.3d at 26 ("[c]onclusory allegations which are not supported by a

20 statement of specific facts do not warrant habeas relief").

21        *Failure to File Motions to Dismiss*

22        Petitioner argues that trial counsel was ineffective for failing to file motions to

23 dismiss the 1996 and 1998 incidents.  (Dkt. 1, pp. 15-16.)  It is unclear on grounds petitioner is

24 claiming counsel should have moved to "dismiss" the uncharged 1996 act and the charge relating

25 to the 1998 incident.  Again, as observed by respondent, trial counsel objected to admission of

26 evidence of the uncharged 1996 fire, but the trial court overruled his objection.  Counsel also

1   sought to introduce evidence involving third-party culpability regarding the 1998 fire, but the

2   trial court ruled this evidence inadmissible.  Trial counsel had no obvious ground on which to

3   move for dismissal of the charges regarding the 1998 incident.

4           Because this claim is vague and unsupported, it should be denied.  James v. Borg,

5   supra.

6                    *Failure to Call Witnesses*

7           Petitioner allege that trial counsel was ineffective for failing to call several

8   witnesses including Margaret Done, Nora Savage, Clement Williams, Tracy Wallace, Renee

9   Martin, Spurgeon Holloway, Holloway, Jr., and Al Garland.  (Dkt. 1, p. 19.)

10          In the answer, respondent observes that petitioner ignores the fact that trial

11  counsel attempted to call Renee Martin as a defense witness to testify regarding third party

12  culpability regarding the 1998 fire.  After an evidentiary hearing (RT at 76-105), the trial court

13  tentatively denied counsel's request to call her as witness unless he could obtain additional

14  evidence in support of this claim.  (RT at 105-07.)  Counsel attempted to locate Clement

15  Williams and Tracy Wallace in support of the third party culpability defense.  Counsel located

16  Tracy Wallace and informed the trial court of what she had told him.  (RT at 153-56.)  At that

17  time, counsel had been unable to locate Clement Williams.  (Id.)  The trial court again tentatively

18  denied counsel's request to present the third-party culpability defense but allowed counsel to

19  continue his investigation.  (RT at 161.)

20          Counsel's later attempts to locate Clement Williams were hindered when Tracy

21  Williams refused to return the phone calls of his investigator.  (RT at 356.)  Following receipt of

22  this information, the trial court denied trial counsel's request to present evidence of the third

23  party culpability defense by way of testimony from Renee Martin or Clement Williams or Tracy

24  Williams, assuming they could all be found.  (RT at 357-59.)

25          Trial counsel could not call Clement Williams as a witness because he could not

26  find him.  Petitioner has presented no evidence demonstrating that counsel did not act diligently

1  in trying to locate Clement Williams.  Nor has petitioner presented evidence, such as a

2  declaration by Clement Williams, demonstrating that Williams would have been able to testify in

3  support of the third party culpability defense.  The same is true for petitioner's claim regarding

4  counsel's failure to call Tracy Williams.

5  In support of his claim that trial counsel was ineffective for failing to call Nora

6  Savage as a witness, petitioner refers to Exhibit A attached to the petition which includes a report

7  by defense investigator Rodger Pogue.  (Dkt. 1, p. 42.)  In his report dated March 6, 2001, Mr.

8  Pogue states that he interviewed Nora Savage by phone and asked her questions regarding the

9  fire in her apartment.  (Id.)  Pogue asked her if she saw what the wick looked like that had been

10  recovered from the broken bottle.  (Id.)  She stated that she had seen it.  (Id.)  When asked if

11  anytime before the fire she had seen a dish towel in her apartment that matched the wick she first

12  stated "no" but then said she did not want to speak about it.  (Id.)

13  Nora Savage is Krouskop's mother.  (Id., p. 96.)  Savage's statements to Mr.

14  Pogue did not assist petitioner's defense.  The fact that Savage was apparently not familiar with

15  the towel used as a wick did not change the fact that towels matching the "wick towel" were

16  found in petitioner's apartment.  Petitioner has not demonstrated that counsel was ineffective for

17  failing to call Savage as a witness.

18  Also attached as petitioner's Exhibit A is a copy of a report by Mr. Pogue of his

19  interview with Margaret Done.  (Id., p. 43.)  This report states that Done had known petitioner

20  for about four years and dated him on a regular basis during that time.  (Id.)  She knew that

21  petitioner had another girlfriend during that time.  (Id.)  She said that petitioner was always a

22  perfect gentleman and had never talked about having knowledge of using any kind of bomb or

23  explosive device.  (Id.)  She had no knowledge of petitioner agreeing to fix up a car for

24  Krouskop.  (Id.)

25  While Done may have been able to testify regarding petitioner's good character,

26  she had no direct information regarding petitioner's involvement, or lack of involvement, in any

1    of the fires.  Petitioner was not prejudiced by trial counsel's failure to call her as a witness.

2         Also attached to the petition as Exhibit A is a copy of a report by Mr. Pogue of his

3    interview with Al Garland.  (Id., p. 44.)  While Garland stated that petitioner was a very

4    personable man, he had no direct knowledge of any of the fires.  (Id.)  Because Garland had no

5    information relevant to petitioner's defense, petitioner was not prejudiced by trial counsel's

6    failure to call him as a witness.

7         Regarding Spurgeon Holloway and Holloway Jr., petitioner does not elaborate on

8    what their proposed testimony would have been.  For this reason, petitioner has not demonstrated

9    that counsel was ineffective for failing to call them as witnesses.  James v. Borg, supra.

10                    *Failure to Present a Defense*

11        While petitioner alleges that counsel was ineffective for failing to present a

12   defense, he does not describe what the proposed defense should have been.  As discussed above,

13   the trial court would not allow trial counsel to present the third-party culpability defense.

14        Petitioner may be suggesting that had counsel conducted a more timely, thorough

15   investigation, he would have discovered additional evidence in support of his third party

16   culpability defense.  However, this claim is not supported by the record.  Petitioner has presented

17   no evidence to support such a claim, such as declarations by witnesses in support this defense.

18        Because this claim of ineffective assistance of counsel is unsupported, it should be

19   denied.  James v. Borg, supra.

20            F.  Denial of Counsel at Sentencing

21        Petitioner argues that he was denied his Sixth Amendment right to counsel at

22   sentencing because he was forced to choose between ineffective assistance of counsel and self-

23   representation.  (Dkt. 1, pp. 5, 7.)  As discussed above, the trial court granted petitioner's Faretta

24   motion just before sentencing.

25        Petitioner has failed to demonstrate that counsel provided ineffective assistance.

26   For that reason, petitioner's claim that his choice to represent himself at sentencing was

1  involuntary is without merit.  <u>Faretta</u>, 422 U.S. at 835 (a defendant's waiver of the right to

2  counsel must be knowing and voluntary).

3      The denial of this claim by the California Supreme Court was not an unreasonable

4  application of clearly established Supreme Court authority.  Accordingly, this claim should be

5  denied.

   G.  <u>Biased Trial Judge</u>

6      Petitioner argues that the trial judge was biased against him, apparently based on

7  his rulings denying petitioner's motions for substitute counsel and for self-representation, as well

8  as his rulings denying petitioner's request to present a third-party culpability defense.  Petitioner

9  may also be claiming that the trial judge showed his bias against him by "excluding" him from

10 the trial.

11     To demonstrate judicial bias, a petitioner must "overcome a presumption of

12 honesty and integrity in those serving as adjudicators."  <u>Withrow v. Larkin</u>, 421 U.S. 35, 47

13 (1975).  Thus, for example, it must be shown that the trial judge "prejudged, or reasonably

14 appears to have prejudged, an issue."  <u>Kenneally v. Lungren</u>, 967 F.2d 329, 333 (9th Cir. 1992)

15 (quoting <u>Partington v. Gedan</u>, 880 F.2d 116, 135 (9th Cir. 1989) (Reinhardt, J. concurring and

16 dissenting)).  Bias can "almost never" be demonstrated solely on the basis of a judicial ruling.

17 <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994).  Accordingly, in assessing a substantive claim

18 of judicial bias on habeas review relief is warranted only if "the state trial judge's behavior

19 rendered the trial so fundamentally unfair as to violate federal due process under the United

20 States Constitution."  <u>Duckett v. Godinez</u>, 67 F.3d 734, 740 (9th Cir. 1995).

21     The undersigned has carefully reviewed the record and does not find that the trial

22 judge was biased.  The trial judge did not prejudge any issue and exhibit any biased behavior.

23 The trial judge showed remarkable restraint and patience with petitioner, who repeatedly engaged

24 in disruptive behavior during his trial.

25     After conducting an AEDPA review, the undersigned finds that the denial of this

26

claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

Conclusion

Petitioner has moved for an evidentiary hearing.  After reviewing the record, the undersigned finds that none of petitioner's claims warrant an evidentiary hearing.

Petitioner's application for a writ of habeas corpus should be denied.  If petitioner files objections, he shall also address if a certificate of appealability should issue and, if so, as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate of appealability must "indicate which specific issue or issues satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 5, 2010

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

spencer.hab